The Honorable Barbara J. Rothstein

David J. Groesbeck
WSBA No. 24749
David J. Groesbeck, P.S.
1333 E. Johns Prairie Rd.
Shelton, WA 98584
Tel.: 509-747-2800
Fax: 509-747-2828
Email: david@groesbecklaw.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| PARLER LLC,<br><br>　　　　　　　Plaintiff,<br>　　v.<br><br>AMAZON WEB SERVICES, INC.,<br><br>　　　　　　　Defendant | No. 2:21-cv-00031-BJR<br><br><br>**PLAINTIFF PARLER LLC'S REPLY TO DEFENDANT'S RESPONSE** |

REPLY - 1



## INTRODUCTION

As with its "suspension" of service to Parler, AWS's opposition to Parler's TRO motion depends on speculation and falsehood. For example, to avoid a clear 30-day notice requirement for terminating its contract, AWS claims its action against Parler was a "suspension," not a termination. But the indisputable facts show that AWS's action was termination: During the final call between Parler and AWS before the latter pulled the plug, AWS officials told Parler's officials that there was nothing Parler could do to get its service back. *See infra* 2–6.

Even more perniciously, AWS's opposition relies heavily on the assertion (at 7) that "Parler was used to incite, organize, and coordinate the January 6 attack on the U.S. Capitol." But AWS offers no evidence to support that assertion, only unsupported speculation from reporters. And AWS has confirmed that none of the arrested participants in that unconscionable attack (who had been publicly identified as of the filing of this action) even had a Parler account, much less used it to "incite, organize or coordinate" the attack. *See infra* 5.

For these and other reasons, AWS's attempt to defeat Parler's TRO motion must fail: Parler has a high likelihood of prevailing on at least one of its claims; it has established irreparable injury in the form of a high likelihood of being forced out of business forever; and it has shown that the equities and the public interest all weigh in favor of a TRO. At a minimum, Parler has established the requisite "serious questions" going to the merits.

**A. For each claim, Parler has demonstrated a likelihood of success.**

    **1. AWS, not Parler, breached the parties' agreement.**

AWS claims (at 7) that Parler failed to identify the specific term of the contract that AWS breached. Yet Parler quoted from the specific term of the contract: Section 7.2(b). Compl., ¶ 39.

REPLY - 2



David J. Groesbeck, P.S.
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

And that section, entitled "Termination for Cause," only allows for termination for a "material breach" of the Agreement if that "material breach *remains uncured for a period of 30 days from receipt of notice* by the other party." Compl., Ex. B, at 6. AWS cannot satisfy the contract because it terminated the contract just over 24 hours after giving notice of what it deemed a material breach. *See infra*.

At no time before January 9, 2021, did AWS notify Parler that Parler was in material breach of the Agreement, thus blindsiding Parler. Matze Dec. ¶ 10. And in the period up until then, AWS implicitly assured Parler that the two companies had a positive relationship that would continue into 2021. Matze Dec., ¶¶ 7–10.

For example, from the beginning of the contractual relationship and repeatedly throughout, AWS was aware of Parler's reactive rather than prospective content moderation policies, using a jury system. Matze Dec., ¶ 6; Peikoff Dec., ¶ 5. And never before January 8, 2021, did AWS express any concerns with that system. Peikoff Dec., ¶ 10; Matze Dec., ¶ 6.

In November, when AWS knew that President Trump would likely begin using a Parler account, Parler and AWS discussed Parler switching to AWS's proprietary databases and software—a move that would mean Parler could not easily leave AWS. Matze Dec., ¶ 8, 11. AWS again attempted in mid-December 2020 to sell Parler proprietary software that would permanently attach Parler to Amazon's hip. Matze Dec., ¶ 7.

Also in November, AWS flagged some content for Parler, but any content that encouraged violence Parler promptly investigated and removed. Peikoff Dec., ¶ 6. For the next month, AWS occasionally sent similar material to Parler, which Parler investigated and removed. *Id*. Not once during this time did AWS inform Parler that Parler's system of handling this

REPLY - 3

David J. Groesbeck, P.S.
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

material was inadequate or that Parler was in breach of its contract. Peikoff Dec., ¶ 8. Neither did AWS flag any specific content from December 19, 2020 until January 8, 2021. Peikoff Dec., ¶ 7. And in mid-December, AWS pledged that it was "definitely in this journey with" Parler regarding abuse reports; and AWS conceded that other customers experienced similar problems with abuse reports and that it expected Twitter would experience "more abuse" reports now that AWS was handling its "timeline workload." Peikoff Dec., ¶ 11; Ex. A. And on January 6, after forwarding a generic complaint to Parler about problematic content, and after Parler informed AWS of its new escalation procedure to further address content moderation issues, AWS responded that Parler should consider the matter "resolved." Peikoff Dec., ¶¶ 9–10; Ex. G.

Likewise, between January 6 and 8, 2021, in texts between an AWS representative and Parler's CEO, AWS expressed no concerns with Parler's content moderation. Matze Dec., ¶ 9; Ex. F. But this same AWS representative repeatedly asked whether the President had joined or would join Parler now that he was blocked by Twitter and Facebook. Ex. F; Matze Dec., ¶ 11.

After Twitter banned President Trump on January 8, the increased new users and activity caused Parler to go down for seven hours, resulting in a backlog of 26,000 instances of content that potentially encouraged violence. Peikoff Dec., ¶ 13; Matze Dec., ¶ 9. However, over the next two days, Parler was able to systematically remove almost all of this content, which progress was reported to AWS, and within 48 hours by the end of Sunday—when AWS shut Parler down—Parler had removed all but some 1,000 problematic posts. Peikoff Dec., ¶ 14.

Parler also identified additional steps it was taking to quickly identify and remove problematic content. Peikoff Dec., ¶ 15. Indeed, AWS had known since mid-December that Parler would be adopting in 2021 an Artificial Intelligence ("AI") system that would *pre-screen*

REPLY - 4

David J. Groesbeck, P.S.
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

inappropriate content, which had shown promising initial results, and there was discussion of Parler adopting AWS's own AI system. Peikoff Dec., ¶ 4–5; Ex. A. But in the end, none of this seemed to matter to AWS.

Furthermore, despite media attempts to tie Parler to the Capitol Riot, not one person that the news media has reported so far (as of the filing of this suit) was arrested for the riot has a Parler account. Matze Dec., ¶ 5. The woman killed by law enforcement when she forced her way into the Capitol Building, Ashli Babbitt, did have a Parler account, but it had not been used since November. *Id*. She also had a Twitter account that *was* in use the day of the riot, January 6, 2020. Ex. D. Even the government claims that the attack was coordinated in part by Twitter.[1] And claims reportedly showing Parler users being involved in the Capitol Riot because the metadata on videos uploaded to Parler reveal the location where they were recorded misunderstand the evidence: Videos recorded by others, shared, and then uploaded by a separate Parler user will still show the original video location, even if the Parler user wasn't there and didn't record the video. Matze Dec., ¶ 4.

Additionally, AWS claims it "suspended and did not terminate the account." Resp., at 7. It is true that in its email to Parler, AWS used the term "suspend." *See* Compl., Ex. A, at 2. However, the Agreement only authorizes a "temporary suspension," Compl., Ex. B, at 5, and two things make clear that there was nothing temporary about AWS's actions. First, the very next sentence in the email after notifying Parler that AWS would "suspend Parler's account" was this: "We will ensure that all of your data is preserved for you to migrate to your own servers,

---

[1] Michael Balsamo & Erick Tucker, *FBI says it warned about prospect of violence ahead of US Capitol riot*, Navy Times (Jan. 12, 2021), https://www.navytimes.com/news/your-military/2021/01/13/fbi-says-it-warned-about-prospect-of-violence-ahead-of-us-capitol-riot/.

REPLY - 5

David J. Groesbeck, P.S.
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

and will work with you as best as we can to help your migration." Compl., Ex. A, at 2. It makes no sense for AWS to migrate all of Parler's data off of AWS's servers for a temporary suspension. Second, after the email notifying Parler that its account would be "suspend[ed]," in conversations with Parler, AWS made it clear that there was nothing Parler could do to continue its relationship with AWS and that this was no mere temporary suspension. *See* Matze Dec., ¶¶ 12–13.

Thus, by its words and actions, AWS evidenced that whatever it wanted to call it, AWS was permanently terminating its Agreement with Parler for Parler's alleged breach of the Agreement. And according to the Agreement's plain terms, a termination for a material breach required 30 days' notice. *See* Compl., Ex. B, at 6. Which notice AWS did not provide, thus clearly breaching the contract.

Why would AWS so willfully breach its contract with Parler? First, Amazon was getting pressure from its progressive employees to use the Capitol riot as an opportunity to suppress conservative voices, and Amazon succumbed to that pressure the same day it was applied.[2] Second, Amazon apparently wanted to support the effort in some circles to deny any meaningful social-media platform to Trump, while at the same time protecting its major client, Twitter, from the economic fallout of Trump's moving from Twitter to a competitor. Compl. ¶¶ 14–20, 22–23;

---

[2] Annie Palmer, *Amazon Employees Call for Company to Cut Ties with Parler after Deadly U.S. Capitol Riot*, CNBC (Jan. 9, 2021), https://www.cnbc.com/2021/01/09/amazon-employees-demand-company-drop-parler-after-capitol-riot.html. *See also* Catherine Ross, *Amazon Employees Demand Company Stop Providing Cloud Services to Parler*, Yahoo! News (Jan. 9, 2021), https://news.yahoo.com/amazon-employees-demand-company-stop-215308868.html (reporting that "[a]n employee advocacy group, Amazon Employees for Climate Justice" are "demanding that the company stop providing services to conservative social media platform Parler, popular among supporters of Donald Trump").

REPLY - 6



David J. Groesbeck, P.S.
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

Matze Dec., ¶ 10.³ Of course, without discovery, Parler doesn't know for sure at this point why AWS chose to breach its contract. But it doesn't have to establish a motive for the breach. It is clear that a breach occurred.

**2. AWS tortiously interfered with Parler's business expectations.**

AWS contends that Parler cannot meet several elements necessary for a claim of tortious interference. *See* Resp., at 9. First, AWS argues that it was merely asserting its right to "suspend" Parler, and therefore Parler lacked a "reasonable expectancy" and cannot assert an interference claim. As noted above, however, this argument collapses in the face of the fact that AWS (a) in substance did not suspend but rather terminated Parler's service, and (b) did so immediately without waiting the required 30 days. *See supra* at I.a.

AWS further posits that "Parler has not alleged any interference was for an improper purpose or done through improper means." Resp., at 9. Yet Parler's Complaint clearly alleges that AWS terminated Parler's account for "political animus" and "to reduce competition in the microblogging services market to the benefit of Twitter," a much larger customer of AWS than Parler. Compl., ¶ 4. And Parler documented the rising threat that Parler was to Twitter, Compl. ¶ 17–19, 22; and how AWS ignored more egregious behavior on the other side of the political spectrum by Twitter, Compl. ¶ 28. Thus, Parler has patently alleged that AWS interfered with the contracts Parler had with its 15 million users, as well as the millions it was expecting to gain in the next short while, out of "greed, retaliation, or hostility." *Elcon Const., Inc. v. E. Wash. Univ.*, 174 Wash.2d 157, 169 (2012).

---

³ *See also* Felix Salmon, *How CEOs Became the 4th Branch of Government*, Axios (Jan. 12, 2021), https://www.axios.com/ceos-fourth-branch-government-trump-7eee851f-0027-4bfa-a2c0-58ec254e2dbe.html ("Tech giants including Facebook, Google, Amazon and Twitter have moved to quiet Trump and the far right.").

REPLY - 7

David J. Groesbeck, P.S.
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

### 3. AWS violated Section 1 of the Sherman Act.

As to the Sherman Act claim: Contrary to AWS's suggestion (at 10), Parler never argued that AWS's contract or any other written agreement with Twitter contemplated harming it *expressly*. The complaint focused not on the AWS contract with Twitter, but rather on the timing of Parler's removal, AWS's lack of concern with Twitter's equally egregious violations, its close business relationship with Twitter, and the harm to Twitter if Parler continued operating after Twitter ejected President Trump. Thus, AWS's decision to pull the plug on Parler after months of mutual cooperation, *see* Section A.1, as soon as it became clear that Twitter—unquestionably the wealthier client—risked losing a substantial share of its base is powerful *circumstantial* evidence of an agreement or conspiracy to restrain trade in violation of Section 1. *See Souza v. Estate of Bishop*, 821 F.2d 1332, 1335 (9th Cir. 1987) ("[A]n antitrust plaintiff may rely upon circumstantial evidence from which a violation may be inferred."); *see* Compl., ¶¶ 19–20.

Next, AWS lacked a legitimate business reason to terminate. Resp., at 10–11. As addressed in Section A.1, AWS at no point expressed any concern with Parler's reactive moderation system despite being aware of it throughout the course of the relationship. *See also* Peikoff Dec. ¶ 7. Indeed, as late as January 8, 2021, Parler and AWS were in regular communication regarding Parler's attempts to better moderate its content following the events at the Capitol and Parler's unprecedented surge in size. Matze Decl. ¶ 7. Communications between Parler and AWS continued until—and stopped almost immediately after—Trump was kicked off of Twitter. Matze Decl. ¶ 7. AWS's willingness to work with Parler until nearly the second it would hurt Twitter—regardless whether AWS currently hosts the Twitter feed or will do so in the future, Amazon

REPLY - 8

David J. Groesbeck, P.S.
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

Executive 1 Decl. ¶ 6—undermines its attempt to cast its decision as a legitimate business decision. Compl., ¶¶ 26, 51.

Finally, AWS claims that Parler failed to explain how competition was harmed—despite Parler's repeated emphasis on how Parler usage had exploded in the weeks before AWS pulled it down, demonstrating a real market need for the more open microblogging platform that Parler can no longer meet. Compl., ¶¶ 17–19, 34. Indeed, Amazon and Twitter, as two of the largest tech companies in the world, with a mutually beneficial contractual relationship, had a clear interest in eliminating an up-and-coming service like Parler with such a demonstrable market. *See* Matze Decl. ¶¶ 10, 13–14. This is a quintessential § 1 claim, and Parler is thus likely to prevail on the merits.

### 4. Section 230 does not bar Parler's interference or antitrust claims.

AWS's immunity defenses under § 230(c)(1) and (c)(2) of the Communications Decency Act—which AWS correctly does *not* assert against Parler's breach of contract claim—also fail. AWS's § 230 claim fails on a plain reading of the statute: 47 U.S.C. § 230(c)(1) simply forbids any "provider or user of an interactive computer service" from being "treated as the *publisher or speaker* of any information provided by another information content provider." Here, Parler does not attempt to treat AWS as a publisher or speaker, nor could it. Under § 230(f)(2), AWS is an interactive computer service, as is Parler. Thus, § 230(c)(1) by its terms shields AWS from liability only for actions or statements "authored by someone else," *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 27 (2d Cir. 2015), but it is not a complete bar to liability for all wrongdoing. Indeed, because antitrust claims do not treat interactive computer services as content providers, at least one court in the Ninth Circuit has held that § 230 does not bar antitrust claims against media

REPLY - 9

David J. Groesbeck, P.S.
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

companies. *Brittain v. Twitter, Inc.*, 2019 WL 2423375, at *4 (N.D. Cal. Jun. 10, 2019). The same logic applies to Parler's interference claim:  Where, as here, a party is attempting to hold an interactive computer service liable for its own unlawful conduct, and not for the conduct or speech of others, § 230 poses no bar. [4]

**B. By establishing a likely threat of extinction if the TRO is not granted, Parler has demonstrated that it will suffer irreparable harm.**

Although, prior to termination, Parler had some hope that it could quickly procure another online host and begin to recover from the effects of AWS's sudden and highly publicized break, the effects of AWS's actions have proven much more catastrophic. The notoriety and fallout from the break-up have driven away current and potential business partners, utterly frustrating Parler's pre-termination plans to quickly replace and recover from AWS. Matze Decl. ¶ 15. Even AWS's own cherry-picked exhibits admit that its actions have left Parler "suddenly fighting for its life" and "all but killed." Doran Decl. Ex. N. Entirely unable to operate its online business or generate revenue, *id.* ¶¶ 13, 18, Parler now faces a real, non-speculative threat of "extinction" which, as the Ninth Circuit has repeatedly affirmed, "is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable." *hiQ Labs v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019).

---

[4] Further, § 230(c)(2) only shields interactive computer services from liability for "action[s] voluntarily taken in good faith" to remove, as alleged here, "excessively violent" and "harassing" content. 47 U.S.C. § 230(c)(2). AWS did much more than remove "excessively violent" and "harassing" content—it removed all of Parler. AWS does not—and cannot—claim that the entire Parler service was "excessively violent" and "harassing" content, and the plain language of § 230(c)(2) therefore cannot shield it from liability. Instead, AWS's decision to fully remove Parler, despite its millions of accounts fully compliant with AWS's terms of service, undermines any claim that it approached this decision with the clean hands necessary for §230(c)(2) immunity.

REPLY - 10

David J. Groesbeck, P.S.
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

In completely shutting down Parler's ability to retain its millions of users, attract advertisers, or generate any revenue, AWS has knowingly inflicted lasting damage to what was, until very recently, a thriving business. Matze Decl. ¶ 3. Parler agrees with AWS (at 13) that much of that harm "would be compensable by damages." But because the severing of Parler from other prospective online hosts has been so pervasive, and because the fallout from AWS's mishandling of the entire break-up has been so toxic to Parler's ability to find other business partners, a TRO restoring AWS's services is necessary to avoid the irreparable harm of Parler's extinction. Matze Decl. ¶¶ 14–16, 18.

**C. The balance of equities and public interest weigh in Parler's favor.**

AWS does not deny that, under the sliding-scale approach of *Alliance for the Wild Rockies v. Cottrell*, a strong showing on one TRO element, particularly balance of the equities, can offset a weaker showing in another. 632 F.3d 1127, 1131 (9th Cir. 2011). And AWS tacitly admits that the balance of equities sharply favors Parler. Although AWS briefly speculates, against logic, that it will risk greater pro-Parler outrage if ordered to *reverse* course, it otherwise fails to deny that AWS itself would suffer little to no inconvenience if enjoined from abandoning the bargain into which it knowingly entered. *See* Matze Decl. ¶¶ 6–8, 10. Weighed against that nominal burden, AWS cannot credibly negate the existential threat its actions pose to Parler's entire business. AWS simply cannot prevail in a balance of equities analysis against the company on which it has inflicted the "very real and immediate prospect of permanent destruction." Matze Decl. ¶ 18.

Rather than fight on properly framed but unavailing terms, AWS tries (at 12) to eliminate the sliding scale altogether by hammering the balance-of-equities and public-interest elements

REPLY - 11

into one factor, thereby co-opting the public's interest as its own. But even properly viewed as a separate element, this claimed risk to the public interest is a mirage. First, AWS is fully aware that Parler's content moderation issues that arose in the wake of last week's violence at the Capitol were attributable to exceptionally acute infrastructure stresses precipitated by an unprecedented spike in new Parler users and exacerbated by AWS's eventual inability or unwillingness to help their own client "cope with these technological problems." Matze Decl. ¶ 9. Second, contrary to AWS's claimed worries that hosting Parler will pose future public risk, including at the presidential inauguration, AWS was aware that, at the time it elected to terminate services to Parler, the latter was already taking steps—including discussions to use Amazon's own AI software—precisely to avert such risk. Matze Decl. ¶ 12. Amazon's desire to escape a contractual obligation, and thereby crush a much smaller company, with minimal inconvenience to itself, does not implicate a substantial risk to the public interest, but weighs decisively against that interest. The TRO is more than warranted.

## CONCLUSION

For the foregoing reasons, Parler's TRO motion should be granted.

Dated: January 13, 2021.

>Respectfully submitted,
>/s David J. Groesbeck
>WSBA No. 24749
>DAVID J. GROESBECK, P.S.
>1333 E. Johns Prairie Rd.
>Shelton, WA 98584
>(509) 747-2800
>david@groesbecklaw.com
>
>*Counsel for Plaintiff*

REPLY - 12

