David J. Groesbeck
WSBA No. 24749
David J. Groesbeck, P.S.
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
Tel.: 509-747-2800
Fax: 509-747-2828
Email: david@groesbecklaw.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| PARLER LLC,<br><br>                  Plaintiff,<br>    v.<br><br>AMAZON WEB SERVICES, INC.,<br><br><br>                Defendant | No. 2:21-cv-00031-BJR<br><br><br>**NOTICE OF SUPPLEMENTAL AUTHORITY**<br><br>**(WITHOUT ORAL ARGUMENT)** |

Plaintiff Parler LLC, by its undersigned counsel and per Local Rule 7(n), files the following Notice of Supplemental Authority:

NOTICE OF SUPP. AUTH. - 1



**David J. Groesbeck, P.S.**
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

## SUPPLEMENTAL NOTICE OF AUTHORITY

This Supplemental Notice of Authority serves to correct several misstatements by AWS's counsel from the January 14 hearing.  These statements concern mainly the nature of AWS's action against Parler, Parler's ability to replace AWS as a critical service provider, and the proper interpretation of AWS's contract with Parler.

1.     During the hearing, AWS's counsel repeatedly stated that AWS was merely "suspending" Parler, as (AWS claims) is allowed under the contract, rather than terminating Parler's account. *See* Hearing Transcript, 12: 14, 22-13:6. And AWS's counsel alleged it was only a suspension because "we're still hosting their data, they still have access to it . . . ." *Id*. 12:22-23. But this ignores that the very email informing Parler that AWS would no longer host its services stated that AWS "will ensure that all of your data is preserved for you to migrate to your own servers, and will work with you as best as we can to help your migration." Parler Complaint Ex. A, at 2. Thus, the email makes clear that although AWS was still preserving Parler's data, it was not doing so to effectuate a future return to AWS. Instead, AWS was looking to give Parler its data so it could find some other way to get back online. That is not a suspension, but a termination.

What is more, AWS's counsel declared that "I can't say what Amazon would do if, you know, if Parler came back and said, here is an effective moderation plan." But Parler had offered to adopt AWS's own artificial-intelligence ("AI")-based content moderation software *before* AWS terminated Parler. *See* Matze Supp. Dec., ¶ 5; Matze Dec., ¶ 12; Peikoff Dec., ¶ 4. If AWS can't say whether it would allow Parler back online with AWS's own content AI systems, then

NOTICE OF SUPP. AUTH. - 2

**David J. Groesbeck, P.S.**
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

an insufficient content moderation system isn't the real reason why AWS terminated Parler's account.

2.      Additionally, AWS's counsel declared that "[t]here's no one from Parler, nobody, who says right now that they have an effective moderation plan and that this is a problem that can even be fixed, much less fixed within 30 days, nor is there any reason to believe that would happen." Hearing Transcript, at 14:8-11. But that is false. As already noted, AWS has known at least as early as mid-December that Parler had an AI system of its own that it had developed, successfully tested, and was planning on implanting in 2021—a system AWS has never expressed concerns about. *See* Matze Dec., ¶ 8; Peikoff Dec., ¶ 4; Matze Supp. Dec., ¶ 6. And as already noted, Parler even offered to adopt AWS's own AI system for its community guideline enforcement. *See* Matze Supp. Dec., ¶ 6; Matze Dec., ¶ 12; Peikoff Dec., ¶ 12. It can't be true that AWS believes its own system lacks the ability to bring Parler's community guideline enforcement into compliance with AWS's own standards.

3.      Further, AWS's counsel represented to this Court that "the reality is, Your Honor, there is no, like—there is nothing—there's no—it would be futile to order the relief because there is nothing to suggest that they could actually do this within a period of 30 days, 10 days, or anything like that." Hearing Transcript, at 14:2-6. When there is nothing Parler can do to satisfy AWS, then AWS cannot rely on the portion of the contract that allows for a "temporary" suspension. Parler Complaint Ex. B, at 5 (Clause 6). The contract does not allow for permanent *suspensions*—and a permanent suspension is in law and fact a termination.

4.      AWS's counsel further stated that "the question about whether this is a termination or a suspension, it is a suspension, but it's a red herring, it doesn't matter for the

NOTICE OF SUPP. AUTH. - 3

**David J. Groesbeck, P.S.**
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

court's analysis." Hearing Transcript, at 12:13-15. And for this view AWS relies on Clause 7.2(b)(ii), which allows AWS to immediately terminate for any reason for which it could temporarily suspend under Clause 6. *See* Parler Compl. Ex. B, at 6. But AWS has never actually shown that it properly invoked its right to suspend or terminate under these clauses. In its Response, AWS references the portion of the contract that authorizes AWS to suspend an account when AWS determines that "your or an End User's use of the Service Offerings . . . poses a security risk to the Service Offerings or any third party . . . [.]" *Id*. at 5 (quoting Cl. 6.1(a)). But the "security risk" referenced here is not referring to potential physical harm to others, but is a common industry term-of-art referring to cyber security in relation to hackers and other sorts of non-physical, internet-only harms. *See* 5 Most Common Network Security Risks (and What They Do), The Ame Group, https://www.theamegroup.com/5-common-network-security-risks/. So AWS cannot leverage those grounds for temporarily suspending Parler to justify an immediate termination.

In addition, the contract at issue is a form contract. And form contracts must be construed "most strongly" against the writer of such contracts—here, AWS. *See Pitts v. Coronado Custom Homes, LLC*, 57 F. App'x 313, 315 (9th Cir. 2003) ("[A]ny ambiguities in the contract between the parties must be construed most strongly against . . . the drafting party.") (internal quotation marks omitted). Also, under AWS's reading of its form contract, Clause 7.2(b)(ii) would make 7.2(b)(i) superfluous, allowing AWS to never have to worry about providing a thirty-day notice. This would also violate the Surplusage Canon (or, the Canon against Superfluity).[1] *See In re*

---

[1] "*Verba cum effectu accipienda sunt*. Words must be taken so as to have effect." Black's Law Dictionary 1967 (10th ed. 2014).

NOTICE OF SUPP. AUTH. - 4



**David J. Groesbeck, P.S.**
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

*Crystal Properties, Ltd., L.P.*, 268 F.3d 743, 748 (9th Cir. 2001) ("[A] court must give effect to every word or term employed by the parties and reject none as meaningless or surplusage.") (citation omitted). *See also City of Chicago v. Fulton,* No. 19-357, slip op. at 5 (U.S. Jan. 14. 2021) (rejecting proffered statutory construction based on surplusage canon), https://www.supremecourt.gov/opinions/20pdf/19-357_6k47.pdf. Thus, for both these reasons, AWS's reading cannot be allowed.

5.      AWS also appears to claim that it can rely on Clause 6.1(b), which authorizes temporary suspension if Parler, "or any End User is, in breach of this Agreement," to invoke Clause 7.2(b)(ii) to allow immediate termination. But this also runs into the Surplusage Canon and the requirement that the contract be "most strongly" construed against AWS. That's because, under that reading, if one End User did *anything* deemed to breach AWS's User Guidelines, AWS could immediately terminate Parler's account. That would turn the contract into an at-will contract, and it would render completely superfluous the contractual protections inhering in both a 30-days' notice provision and a threshold for material breach. After all, if AWS can immediately terminate Parler's account for a breach by a single end user, then Clause 7.2(b)(ii), which demands 30 days' notice for a *material* breach, serves no purpose. Parler's reading of AWS's form contract is "[t]he better account of the two provisions . . . ." *Fulton,* slip op. at 5.

6.      Another allegation of AWS's counsel during the hearing was that Parler could easily get back online because Parler "can store the stuff on their own servers." Hearing Transcript, at 16:20. This is untrue. Parler does not own its own servers. *See* Matze Supp. Dec., ¶¶ 2-3. *See also* Owen Williams, *How AWS and Other Cloud Providers Became the Internet's Most Powerful Moderators: In Another Era, Parler Would Have Owned its Servers—and*

NOTICE OF SUPP. AUTH. - 5



David J. Groesbeck, P.S.
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

*Remained Online*, Medium (Jan. 15, 2021), https://onezero.medium.com/how-aws-and-other-cloud-providers-became-the-internets-most-powerful-moderators-9b23a954d68a ("With cloud providers rejecting them and no physical servers of its own, Parler has nowhere to go and now says it may never return."). This is not unusual for companies like Parler. "Amazon Web Services . . . [and other similar] companies manage vast data centers full of servers, renting them out by the hours, so you don't need to think about setting up your own gear. They have centralized much of the web, which gives them unprecedented power to police it." Williams, *How AWS and Other Cloud Providers*, *supra*. Thus, "[w]hen Amazon booted Parler from its cloud platform, there was little the company could have done to stay online, . . . gone are the days when it was common for small companies to own servers. It's simply not realistic anymore." *Id*. Even the Ninth Circuit's own video oral argument system is hosted by a third-party private server. *See* https://www.youtube.com/user/9thcirc. There is simply no way for Parler to remain competitive and therefore viable without using someone else's servers. *See* Matze Supp. Dec., ¶¶ 2-3. And AWS knew this when it pulled Parler's plug. *See* Matze Supp. Dec., ¶ 2.

AWS also knew that beyond just infrastructure, AWS was providing crucial cyber security and services. *See* Matze Supp. Dec., ¶ 2. There are very few vendors large enough to provide this type of service, severely limiting Parler's ability to find a replacement. *See id*.

7.      Furthermore, in claiming during the hearing that "there is no irreparable harm," AWS's counsel alleged that "[t]here's no showing, for example, that they went to other providers." Hearing Transcript, at 16:16-17. As stated in the attached Matze Supplemental Declaration, Parler went to six other large potential providers. *See* Matze Supp. Dec., ¶ 5. None would host Parler either because of AWS's defamation of Parler, or because of AWS's actions.

NOTICE OF SUPP. AUTH. - 6



David J. Groesbeck, P.S.
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

*See* Matze Supp. Dec., ¶ 5; Matze Dec., ¶ 15. And none of these providers is now willing to be publicly known—for fear of the harm AWS has the potential to inflict. *See* Matze Supp. Dec., ¶ 5.

For example, as soon as Parler learned that no matter what it did—including adopting AWS's own AI system to enforce Parler's community guidelines—AWS was going to terminate Parler's account, Parler found another provider who said it was willing to host it. But after AWS took Parler offline, it did a very curious thing. Despite shutting down all of its services to Parler, AWS left open Route 53, "a highly scalable domain name system (DNS) . . . , which conveniently directed hackers to our backup datacenters and caused them to initiate a sizeable DNS attack." Matze Dec., ¶ 14. In other words, AWS essentially illuminated a large neon arrow directing hackers to Parler's backup datacenters. And the hackers got the message, launching an extremely large attack—one 250 times larger and 12-24 times longer than the average DDOS attack.[2] Later AWS would terminate the Route 53 link, but the damage was done. And this AWS-facilitated attack "essentially became a threat to all future datacenters that, if they were to host Parler, they would be attacked by unprecedented hacks." Matze Dec., ¶ 14. In short, AWS's highly publicized break from [its] contractual relationship [with Parler], when coupled with the toxic notoriety of massive hacking attacks, has driven away nearly all . . . other hosting services that Parler had hoped to use." Matze Dec., ¶ 15. AWS didn't just put Parler up a creek without a paddle—it banished it up the Columbia River without a boat and made sure no other boats would be willing to come to the rescue.

---

[2] The hackers launched a DDOS attack of 250 gbps (gigabytes per second) for 12 hours. The average DDOS attack is only 1 gbps and lasts for 30-60 minutes. *See* Sam Cook, *DDoS Attack Statistics and Facts for 2018-2020*, Comparitech (Nov. 10, 2020), https://www.comparitech.com/blog/information-security/ddos-statistics-facts/.

NOTICE OF SUPP. AUTH. - 7

**David J. Groesbeck, P.S.**
Attorney and Counselor
1333 E. Johns Prairie Rd.
Shelton, Washington 98584
(509) 747-2800

8.      If all this wasn't enough, AWS contends that Section 230 shields it from suit here. In addition to the reasons Parler explained in its original briefing, the Ninth Circuit has provided another reason to reject AWS's argument. In *Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040 (9th Cir. 2019), a software provider brought state and federal claims against a competitor. The competitor argued that it was immune under Section 230 of the Communications Decency Act. *Id*. at 1044. But the Ninth Circuit disagreed and held that "immunity under [§ 230] does not extend to anticompetitive conduct," whether alleged in federal or state claims. *Id*. at 1054. AWS's federal and state claims all are based on allegations of anticompetitive conduct. Therefore, under Ninth Circuit precedent, AWS cannot hide behind § 230.

In sum, Parler is an internet company that cannot get on the internet. And the longer Parler lies dead, the harder it will be to resuscitate. Parler therefore requests that the Court rule as quickly as possible on what both sides agree has been converted into a request for preliminary injunction.

Dated: January 18, 2021.

Respectfully submitted,


/s David J. Groesbeck
WSBA No. 24749
DAVID J. GROESBECK, P.S.
1333 E. Johns Prairie Rd.
Shelton, WA  98584
(509) 747-2800
david@groesbecklaw.com

*Counsel for Plaintiff*

NOTICE OF SUPP. AUTH. - 8