1          UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3  _____

                                    )
4   PARLER LLC,                     ) C21-00031-BJR
                                    )
5                     Plaintiff,    ) SEATTLE, WASHINGTON
                                    )
6   v.                              ) January 14, 2021 -
                                    ) 10:00 A.M.
7   AMAZON WEB SERVICES, INC.,      )
                                    ) Motion Hearing
8                     Defendant.    )
                                    )
9                                   )
  _____

10

           VERBATIM REPORT OF PROCEEDINGS
11    BEFORE THE HONORABLE BARBARA J. ROTHSTEIN
            UNITED STATES DISTRICT JUDGE
12  _____

13

14   APPEARANCES:

15   For the Plaintiff:      David J. Groesbeck
                             David J. Groesbeck PS
16                           621 W. Mallon Avenue
                             Suite 507
17                           Spokane, WA 99201

18

19   For the Defendant:      Ambika K. Doran
                             Davis Wright Tremaine
20                           920 Fifth Avenue
                             Suite 3300
21                           Seattle, WA 98104

22

23

24

25

Proceedings stenographically reported and transcript produced with computer-aided technology

1            THE CLERK:  Good morning, Your Honor.  We have everybody

2    here, if you would like me to go ahead and call the case.

3            THE COURT:  If you would please, Grant.

4            THE CLERK:  Thank you, Your Honor.

5        The United States District Court for the Western District of

6    Washington is now in session.  The Honorable Barbara J. Rothstein

7    presiding.

8        This is the matter of Parler LLC versus Amazon Web Services,

9    Incorporated, Cause No. C21-31, assigned to this court.

10       Will counsel please make their appearances for the record?

11           MR. GROESBECK:  Thank you.  This is David Groesbeck on

12   behalf of Parler LLC.

13           MS. DORAN:  Yes.  Ambika -- I'm sorry.  Ambika Kumar

14   Doran on behalf of Amazon Web Services.

15           THE COURT:  Good afternoon all, or I guess for you it's

16   good morning.

17           MR. GROESBECK:  Good morning.

18           THE COURT:  We're ready to proceed with argument.

19       Mr. Groesbeck, I have allowed a half an hour.  Do you want to

20   save some time for rebuttal?

21           MR. GROESBECK:  I will.  And, Your Honor, frankly, I

22   don't think it will be a half hour of argument on behalf of

23   Parler.

24           THE COURT:  Fine.  Well, why don't you lead off then, if

25   you would, please?

1          MR. GROESBECK:  Great.  Thank you very much.

2      And may it please the court, the court is very familiar

3  obviously with --  Can you hear me okay?

4          THE COURT:  Yes, I hear you just fine.

5          MR. GROESBECK:  The court is very familiar with what is

6  required in order to grant a TRO, as well as a preliminary

7  injunction; however, Parler LLC's motion for TRO should be

8  granted because it has shown that it will suffer and has suffered

9  irreparable harm.  By shutting Parler down entirely, Amazon Web

10  Services, or I will be using the acronym AWS, has necessarily

11  shut down all of Parler's more than 15 million accounts and,

12  through advertising, its sole source of revenue.  The company now

13  has no income to meet its overhead or other financial

14  obligations.  On the other hand, when AWS terminated Parler on

15  Saturday night at 11:59 p.m., excuse me, Sunday night, you know,

16  it's very easy to maintain the status quo, i.e., Amazon just has

17  to switch -- has to flip a switch and then the content wouldn't

18  be on there.

19      Going back to sort of this --  To give you a historical

20  timeline here, Parler has been with Amazon, who does a hosting

21  service, for about two and a half years, and over time, AWS and

22  Parler have met and conferred over some user content that was

23  violative of not only Parler's user requirements but also

24  Amazon's.  And, in fact, there was some discussion between

25  Parler's representatives as well as with Amazon that, in

1    December, where there was some content that needed to be

2    regulated, and they did that.  So between, essentially,

3    December 18th or so and January 8th, there was, essentially, not

4    really a peep from AWS.  And so, you know, AWS knew --  Well, let

5    me sort of give you --  By way of background, I'm not on social

6    media, but I have learned a lot, and so, hopefully, if I use some

7    terms, Your Honor, and you don't understand them, perhaps

8    Ms. Doran and I can help clarify those.

9        But the AWS model, which they had been in the process of

10   changing, was what they called a reactive model.  In other words,

11   you would have user content, and then there would be jurors,

12   essentially, that were volunteers, but also paid personnel from

13   Parler, but they reacted to the posts.  They were in the process

14   of changing that, all with the help of AWS, in that they were

15   going to a proactive model.  One of the reasons why they were

16   going to be proactive is because Parler was finding that they

17   were having many users sign up for their service, and so --

18   but --  And how you become proactive in the social media pipe,

19   you know, pipeline, is that there's artificial intelligence that

20   will, if there's a message that goes out or content, there is

21   this algorithm that sort of sees where the speech is so they can

22   regulate it better.  And, effectively, Amazon, you know, gave a

23   generic complaint on last Friday, on January 8th, and then they

24   were terminated on January 9th, and then the server was cut down

25   on Sunday at 11:59.

1      You know, interestingly, months before they were terminated,

2   AWS had spent months trying to create a long-term relationship

3   with Parler.  So, for example, there was some discussion that

4   Parler would go ahead and be hosted on -- it's more software

5   stuff, but it's a proprietary system from Amazon.  They were

6   solicited by Amazon to work with venture capitalists, in other

7   words, to get more money so that Parler could grow in their

8   significance.  Unfortunately, the communications broke down

9   between the parties and the contract was terminated.

10      But it's important to know that Amazon alleges in their

11   pleadings that, well, it wasn't really a termination because, in

12   reality, it was a suspension.  Well, you know, that's -- you

13   know, if you are taken off the server, you've got, essentially,

14   ten hours' notice or thereabout -- no, 20 hours', I think it was,

15   notice that they were going to be terminated.  That is a

16   termination.  That's not a suspension.  And since that time, AWS

17   has not indicated any good-faith efforts to get the site up and

18   going and, number two, that to help Parler out.

19      So all these actions taken by AWS demonstrate irreparable

20   harm, an injury, and, you know, I think that's the most important

21   one.

22      Number two, with respect to the public interest --  Oh, let

23   me go back on one thing that I wanted to say.  On or about

24   January 7th, Thursday, which was the day after the riots on

25   Capitol Hill, AWS is now alleging, but without evidence

1   whatsoever, that Parler was used to incite the riots.  And there

2   is no evidence of that.  In fact, you know, even more so is

3   because Parler has not had access to its data.  They can't even

4   go and try to look up the data to see what was there.  In other

5   words, they're holding the key that my clients cannot obtain.

6       And so, you know, the benefits to be restored will, you know,

7   also have a public interest, an equities issue as well, because

8   millions of law-abiding Americans have had their voices silenced

9   by AWS's decision.  And, really, granting the temporary

10  restraining order would merely require the parties to maintain

11  the pre-action status quo.

12      Now, in the declarations that were filed by the CEO, John

13  Matze, and then -- excuse me, Your Honor -- and Amy Peikoff, they

14  demonstrate that because of the surge in popularity of Parler,

15  and I think that -- you know, we claim that that was because

16  President Trump had decided or, excuse me, Twitter had suspended

17  his Twitter account, and so there was speculation that he would

18  move over to Parler.  Well, you know, as any company that is

19  growing in popularity --  In fact, I believe that the -- you

20  know, Mr. Matze's declaration, you know, he stated that they were

21  the highest Apple App or they had more people buying that App in

22  at least the last month, probably the last two.  And so, sure,

23  once they had the surge in new people, there had been some

24  content that was both violative of Parler's guidelines as well as

25  Amazon's.

1      With respect to the -- with respect to that, as it's borne

2  out in the declarations, the Twitter -- excuse me -- Parler had

3  lost service for about seven hours, and so during that time, they

4  were able to remove, essentially -- they had 26,000 content that

5  they were manually deleting or getting rid of so that they would

6  be compliant.  At the very end and right before AWS terminated

7  them, they had it down to 1,000 content pages.  So I think it's

8  disingenuous for AWS to say that --  In fact, you know, in their

9  briefing, they spent a lot of time on the hate mail that they

10  pulled down.  And, again, it's not part and parcel to Parler.

11  Twitter has the same issues.  And, again, I brought that up in my

12  brief.  You know, even after the riots, Twitter left on, I think

13  it was probably three days I believe it was, you know, a hashtag,

14  or whatever it is, "hangmikepence."  In other words, I think

15  social media is struggling with content, especially when faced

16  with a surge in popularity, but also where their voices could be

17  heard.  But there is no evidence, other than some anecdotal press

18  references, that Parler was involved in inciting the riots of

19  January 6th.

20      So looking at the public interests and the equities and that

21  balance, you know, those maintain the status quo.  Sure, they'll

22  still -- you know, both parties will have to meet with their

23  commitments and honor those and then go from there.

24      By the way, Parler has not been able to locate any service,

25  web hosting, for their content, and there are reasons for that,

1    as explained by Mr. Matze.  And at the end of his declaration,

2    you know, he -- you know, he's had deaths threats, he's had

3    vendors that have left because of Amazon's conduct, and he's had

4    hate mail.  He wants to make sure that the platform is -- you

5    know, that the community guidelines and their user guidelines are

6    fulfilled.

7         Of the three causes of action, the breach of contract I think

8    is a clear one.  And, again, for purposes of this temporary

9    restraining order, again, having Amazon flip the switch back up

10   is not a big deal, it's not burdensome, it's not costly, and

11   so --

12        THE COURT:  Let me interrupt you a minute,

13   Mr. Groesbeck.

14        MR. GROESBECK:  Sure.

15        THE COURT:  What do you say about the portion of the

16   contract that Amazon cites, 7.2(b) two little i's, which seems to

17   provide for immediate termination?

18        MR. GROESBECK:  Yes, but it's a short termination.  In

19   other words, it's not -- it doesn't contemplate -- and that's for

20   a material breach.  Okay.  And so -- but it's a temporary

21   suspension.  And, instead, they took Parler, you know, completely

22   off.

23        THE COURT:  How do you get to temporary suspension from

24   termination?  Termination --

25        MR. GROESBECK:  Well --

1          THE COURT:  -- means termination and --

2          MR. GROESBECK:  Right, right.  And, again, I think AWS

3     is being a little cheeky by using that term because they don't

4     want to say that they terminated because then they know that

5     they're admitting to violating their own agreement.  But it is a

6     termination.  And not only that, AWS has indicated that they have

7     no desire to keep Parler.  And, at most, they've said, hey, we

8     will help you move our files over to your new server.  But,

9     again, in this day and age, that's a very difficult proposition.

10          THE COURT:  Okay.  Well, let me ask you something.  And

11     if you want a few minutes to think about this, you can always

12     answer me later.  At what point --  Your TRO was filed before the

13     actual, whatever you are going to call it, suspension/

14     termination.  So we have already moved on to a different phase of

15     things.  So the actual wording of your initial TRO, but we've all

16     moved on.  The briefs clearly recognize the current status.

17          MR. GROESBECK:  Sure.

18          THE COURT:  So my question to you is this.  We now have

19     had notice, court-ordered notice.  You did that.  You use notice

20     now.

21          MR. GROESBECK:  Yeah.

22          THE COURT:  The parties have had agreements to file

23     briefs.  At what point do you think the TRO request turns into a

24     preliminary injunction request?  I know, you know, the

25     requirements are exactly the same.  Is it just a matter of

1    terminology, or do you really think we should stick with the TRO

2    terminology?  What's your thinking?

3         MR. GROESBECK:  Yeah.  Thank you, Your Honor.

4    And I will just sort of fill in the time frame.  On the 9th,

5    Parler was given notice of termination.  Parler scrambled.  But

6    the termination said effective the 10th at 11:59.  So I completed

7    paperwork on the 10th.  Unfortunately, I was unable to file it,

8    and only because I apparently didn't realize I had to update the

9    enhanced ECF filing system or the -- apparently ECF, and so I was

10   locked out.  I immediately, you know, sent an e-mail Sunday night

11   to Pacer, and by seven -- I think it was 7:56 on Monday morning,

12   they said, oh, everything is good, you are good to go to file.

13   And so that's why you saw the date of January 10th, you know,

14   under my signature line.  But it was filed on Monday, the 11th,

15   and --

16        THE COURT:  Well, I'm not concerned about that.  I was

17   just asking you, should we still consider it a TRO rather than --

18        MR. GROESBECK:  Yeah.

19        THE COURT:  -- a preliminary injunction?

20   The court will do it either way because, you know, the

21   criteria for it are exactly the same.

22        MR. GROESBECK:  Yeah.  And further -- and thank you for

23   reminding me of the question -- we looked at this and we thought

24   the easiest way to get in was, you know, asking for a TRO and

25   then later following that up with a preliminary injunction

1  motion.  And I didn't ask for oral argument because I thought,

2  you know, we will get this on briefing.  But I'm happy to be here

3  today.

4      So I would say that we would want a preliminary injunction.

5  And you're right, that's exactly what the standards are, as I

6  opened up with.  So I think that -- and it was more of the timing

7  and, you know, trying to put stuff together.

8          THE COURT:  Okay.  So -- Okay.  That sort of was my

9  thinking, that we have really progressed past the TRO situation

10  once we've had briefing and even now oral argument.  Okay.

11          MR. GROESBECK:  Yes, Your Honor.

12          THE COURT:  Okay.  So was there -- was there anything --

13          MR. GROESBECK:  I'll --

14          THE COURT:  Yeah.

15          MR. GROESBECK:  I'll just reserve the rest of my time.

16          THE COURT:  Okay.  Fine.

17          MR. GROESBECK:  Yeah.

18          THE COURT:  All right.

19      Ms. Doran.

20          MS. DORAN:  Yes, Your Honor.

21          THE COURT:  You're up.

22          MS. DORAN:  Good morning.

23      The TRO should be denied because nothing in Amazon's

24  contract, antitrust law, or Washington tort law can compel Amazon

25  to continue hosting on its servers content that incites violence.

 1   And while there are some disputes in this case, there is no

 2   dispute that the content at issue, which encourages rape, murder,

 3   and torture, violates the parties' agreement.  And the examples

 4   of that content in our briefing are just that, they are examples,

 5   they are the tip of the iceberg.

 6       I would like to talk first about the contract claim.  The

 7   sole issue here is whether Amazon was required to provide 30

 8   days' notice.  It was not.  And I would direct the court to the

 9   exact section that you raised, which is 7.2(b) little two, as you

10   put it, which says, "We may also terminate this Agreement

11   immediately upon notice to you (A) for cause if we have the right

12   to suspend you under Section 6."

13       So the question about whether this is a termination or a

14   suspension, it is a suspension, but it's a red herring, it

15   doesn't matter for the court's analysis.  Amazon had every right

16   to do what it did under the contract.

17       Now, I'm happy to answer questions about the antitrust or

18   tortious interference claim if you have them, otherwise --

19           THE COURT:  Well, I'm going to just ask you.  You are

20   telling me this is a suspension.  Why isn't it a termination?  It

21   sure looks like a termination.

22           MS. DORAN:  It's a suspension because we're still

23   hosting their data, they still have access to it, and, you know,

24   it was the --  You know, keep in mind, Amazon had to make this

25   decision in a very quick amount of time given the events on

1   January 6th.  So what they did was they suspended the account.

2   Now -- now, they didn't say -- I mean, Mr. Matze says this in his

3   declaration, but I can tell you, the people who are on the phone

4   from Amazon don't remember saying this is a termination, this is

5   the end.  What they said was, we have to suspend your account

6   tonight, come back to us if you have a different moderation plan.

7   And now they have taken it as a termination.  But it doesn't

8   matter, Your Honor.  Even if Your Honor -- you don't even need to

9   reach the question of whether it's a suspension or a termination

10  because the result is the same.

11          THE COURT:  But, in practicality, does that mean Amazon

12  is still open were there to be a moderation plan or screening

13  plan that looked defective?  Am I putting you on the spot by

14  asking about a decision that hasn't been made?

15          MS. DORAN:  Yes.  And that's definitely right, Your

16  Honor.  I don't know.  I don't know what would --  You know, a

17  lot of stuff has happened over the last several days.  We keep

18  getting more and more information.  You know, Mr. Groesbeck made

19  the comment that there's no evidence that, you know, Parler was

20  linked to the attacks on the Capitol on January 6th, but we also

21  know just in the last couple of days there are indictments or at

22  least one indictment that's been unsealed that shows that, in

23  fact, that is false, that somebody -- people are being indicted

24  for the threats that they have made on Parler in connection with

25  the attacks on the Capitol.  So I can't say what Amazon would do

1    if, you know, if Parler came back and said, here is an effective

2    moderation plan.  And the reality is, Your Honor, there is no,

3    like -- there is nothing -- there's no -- it would be futile to

4    order the relief because there is nothing to suggest that they

5    could actually do this within a period of 30 days, 10 days, or

6    anything like that.

7         And I would like to tell you a little bit more about why that

8    is.  There's no one from Parler, nobody, who says right now that

9    they have an effective moderation plan and that this is a problem

10   that can even be fixed, much less fixed within 30 days, nor is

11   there any reason to believe that that would happen.  Parler, in

12   the words of its CEO, and what Mr. Groesbeck just said right now,

13   suffered infrastructural stresses that resulted in content

14   moderation plans after January 6th, so much so that when it

15   received a, quote, "intense burst of activity and new users," it

16   shut down for seven hours, and during those seven hours, there

17   were 26,000 reports of abusive content, and yet Parler's CEO

18   said they were expecting even more users.  They had 15 million

19   users when the suspension was in effect.  They say they were

20   adding at a rate of one million per day.  Basically, they were

21   expecting even more when -- if and when President Trump joined

22   the service, meaning that by Inauguration Day, a day where there

23   were threats of violence and still are threats of violence, they

24   would have had 25 million users as opposed to the 15 million

25   users that shut down their service for seven hours and resulted

1     in more than 26,000 reports of abuse.

2        So whether -- you know, again, whether it's a suspension or a

3     termination is irrelevant.  And, you know, there is no reason to

4     think, in fact, that they could develop an effective moderation

5     plan.  They had been unwilling to and they are unable to.

6             THE COURT:  Okay.  You were going to move on and address

7     one of the other issues, I believe.

8             MS. DORAN:  Yes, Your Honor.  I was going to just talk

9     briefly about irreparable harm, since that seems to be something

10    that Parler is focused on.  I just want to point the court to

11    page 11 of their brief, which says it agrees with AWS that much

12    of its harm "would be compensable by damages."  That's an

13    admission.  And there's nothing in the brief about why -- what

14    that means, you know, what "much" means.  What is the rest of the

15    harm that can't be remedied in that way?

16       So I don't -- I think there is no irreparable harm.  There's

17    no showing, for example, that they went to other providers.  I

18    mean, there's a generic assertion, we can't find anybody, but we

19    don't know who they tried.  We don't know -- they don't have to

20    use cloud services.  They can store the stuff on their own

21    servers.  There are lots of alternatives that they haven't

22    addressed.  And they have admitted in their briefing that it

23    would be compensable by monetary damages.

24            THE COURT:  Okay.  Okay.  Is there anything else?

25            MS. DORAN:  Your Honor, if you have questions about the

1    antitrust or tortious interference claim, I'm happy to address

2    them.  Otherwise, I have -- I don't have anything further.

3            THE COURT:  Well, I do have a question about the

4    antitrust claim, in that, is Amazon providing the same services

5    to Twitter that it provided to Parler?  I mean, they're making a

6    claim that -- they're analogizing and drawing a parallel between

7    themselves and Twitter.  Is that an accurate characterization?

8    Are they the same?

9            MS. DORAN:  No, Your Honor.  And if you look at -- I

10   can't remember which executive's declaration it is.  We make

11   clear that Twitter's live feed, which is where, you know, the

12   Tweets appear, does not run on AWS.  So it's not accurate to say

13   that Amazon could have taken the same action with respect to

14   Twitter that it took with respect to Parler.

15           THE COURT:  Okay.  I think that's the last of my

16   questions.

17           MS. DORAN:  Okay.

18           THE COURT:  Anything else?

19           MS. DORAN:  No, Your Honor.

20       I would just underscore that, you know, with respect to the

21   balance of equities and the public interest, those also clearly

22   favor denying injunctive relief here.  You know, the events of

23   January 6th changed the way we think about the world, took what

24   was merely hypothetical and made it chillingly real.  Amazon had

25   every right, after that happened, with the surge of content,

1    violent content on Parler, to take that into account when it made

2    the decisions it did.  There is no dispute that Parler was in

3    violation of its contract.  There is no dispute that it signed

4    that contract in 2018, and that contract is pretty clear about

5    what it had to do, and it failed to do that.  And after

6    January 6th and with the threats of violence at the inauguration,

7    Amazon made the only real choice it could, which was to suspend

8    the account.

9            THE COURT:  I do have one question.  You were talking

10   about injunctive relief, and that raised in my mind, again, do

11   you think that we would be justified in treating this as a

12   preliminary injunction rather than a temporary restraining order?

13           MS. DORAN:  Yes, Your Honor.  I think you have -- I

14   mean, the only thing I would say is this:  You know, they dumped

15   a bunch of declarations and evidence into the record on reply,

16   evidence that presumably they had access to when they filed their

17   motion.  I got them at 5 p.m. last night.  So, you know, I

18   don't -- I agree that the parties have had the opportunity for

19   briefing.  I would just say that Amazon has not had a chance to

20   address that evidence.  But, yes, this is a more fulsome record

21   and preliminary injunctive relief could be addressed as well.

22           THE COURT:  Thank you very much.

23           MS. DORAN:  Thank you.

24           THE COURT:  Okay.  Mr. Groesbeck.

25       Where is he?

1          MR. GROESBECK:  Thank you.  Thank you, Your Honor.

2          THE COURT:  There you go.

3          MR. GROESBECK:  Yeah.  A couple things that I would like

4     to respond.

5       So these 26,000 reports that were part of the surge, they

6     were cleared out within 48 hours.  Okay.  And that's after

7     Parler had been offline because of the surge.

8       Number two, Amazon and Parler were in negotiations, as I

9     said, but I think it's an important fact; they were in

10    negotiations to actually use Amazon's AI service, artificial

11    intelligence, as I discussed with you, which has special

12    algorithms to knock these down.  Amazon wanted to sell that

13    product to them.  They also wanted to sell -- you know, promote

14    private capital so that they could grow.  And this all happened,

15    you know, within the last months or so.  So they had a good

16    relationship.  Like I said, there was some content messaging that

17    Amazon asked them to remove, I think it was December 19th I

18    believe, and between December 19th and January 8th, there was

19    no -- there was not one, you know, shot across the bow, so to

20    speak, about, you know, "Hey, this is a problem, you know.

21    What's going on?"  All they said was, "We're going to suspend

22    you."

23       And, you know, on that, on that -- on that note, you know,

24    AWS has not made any other allegation on any other of the grounds

25    for a temporary suspension.  In other words, they're calling it a

1   temporary suspension, but they gave no other reason.  And so I

2   think that's important to know.  And then -- but if, you know --

3   So Ms. Doran argued that there's -- you know, she doesn't believe

4   on behalf of Amazon that there would -- that Parler would be able

5   to change the concept, to change their, you know, their structure

6   to, you know, handle this, and I say, well, we should have the

7   opportunity to.  Because they have.  And so I will leave it with

8   you on that.

9       I won't address the other two claims as far as the --

10          THE COURT:  I do have a question for you.

11          MR. GROESBECK:  Sure.

12          THE COURT:  Why wouldn't damages be sufficient to

13  compensate if we go through and they don't renew their services?

14  Why wouldn't damages be sufficient here?

15          MR. GROESBECK:  Thank you, Your Honor.

16      A couple reasons.  Number one is, this is not a subscription

17  service.  So it's not like they get, you know, $15 a month or

18  something like that.  The site is supported by advertisers, okay,

19  and so they're gone, you know.  So they have no revenue coming

20  in.  So, sure, I suppose if, you know, Parler had a lot of money

21  and a couple years to litigate, you know, on a breach of contract

22  claim, there might be damages, but I think the -- you know, in

23  addition to, you know, taking, you know, 15 million people's

24  voices and to turn them off to their social peers is harmful, and

25  for that reason alone, they can't -- you can't make that up in

1  money damages.  So I think there's money damages that could --

2  you know, we can come to a calculation, as in most cases, but

3  during the gap, whatever it is, that's going to be harmful to

4  Parler.

5          THE COURT:  And the emergency situation that would

6  justify a TRO is what?

7          MR. GROESBECK:  Well, I think the -- that number one is

8  leaning towards, you know, the preliminary injunction.  You know,

9  even if we had a supplemental brief, that would be required.  But

10 I think the case was briefed well and the court is aware of the

11 position.  So I would say that, you know, a PI is a better

12 avenue, and that's what we would request.

13         THE COURT:  Okay.  Well --  Oh, let me ask you one

14 question, Mr. Groesbeck, while I have you here.  There is a

15 motion about sealing the record.  You haven't filed an objection.

16 Do you have an objection?

17         MR. GROESBECK:  Well, I tried to call Ms. Doran this

18 morning.  I was not able to reach her.  But she and I had been in

19 communications, and on her representations, I don't know, but

20 based on what she told me -- which is also what we were following

21 with.  We were sensitive with the court, you know, the public

22 record and that people getting access.  But we also have -- we

23 did a few redactions, as you noticed in our pleading.  I was

24 going to -- I just got inundated yesterday, but I was planning on

25 following Local Rule 5(g) and making sure that that's put

 1   together so that I can file that with the court.  But, basically,

 2   I can represent to you that it was personal information.  So she

 3   had asked, which we complied with, she said, you know, please

 4   don't give out Amazon people's names.

 5          THE COURT:  Well, the question I had is, are you

 6   objecting to her motion to seal?

 7          MR. GROESBECK:  No.  No.  But it's based, Your Honor, on

 8   the representation that she had made to me that it was, you know,

 9   personal information that they didn't want out there in the

10   public.

11          THE COURT:  Okay.  Well, thank you very much.  Thank

12   you.  Thank you, Ms. Doran.  I appreciate counsel coming and

13   doing argument on such short notice.  And we will try to get you

14   an order as quickly as possible.

15          MR. GROESBECK:  Thank you, Your Honor.

16          THE COURT:  Great.  Bye-bye.

17          MS. DORAN:  Thank you, Your Honor.  Bye-bye.

18          THE CLERK:  Thank you.  Court is at recess.

19                    (Adjourned.)

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3        I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

 4   United States District Court in the Western District of

 5   Washington at Seattle, do certify that the foregoing is a correct

 6   transcript, to the best of my ability, from the record of

 7   proceedings in the above-entitled matter.

 8

 9

10                          /s/ Nickoline Drury

11                          Nickoline Drury

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```