UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PARLER LLC, | )<br>) |
| *Plaintiff*, | )<br>)  CASE NO.    2:21-cv-0031-BJR |
| v. | )<br>)  ORDER DENYING MOTION FOR<br>)  PRELIMINARY INJUNCTION |
| AMAZON WEB SERVICES, INC., | )<br>) |
| *Defendant.* | )<br>)<br>) |

## I.   INTRODUCTION

This matter comes before the Court on a Motion for Temporary Restraining Order ("TRO"), filed by Plaintiff Parler LLC ("Parler"). Dkt. No. 2. Parler is seeking to have the Court order Defendant Amazon Web Services, Inc. ("AWS") to reinstate AWS's web-hosting services that AWS provided Parler under the parties' Customer Services Agreement. Parler initially filed the motion as one requesting a TRO, but after the Court ordered Parler to serve AWS notice, ordered additional briefing, and held a hearing, the parties agree that the motion has been converted to one for a preliminary injunction.

In its Complaint, Parler asserts three claims: (1) for conspiracy in restraint of trade, in violation of the Sherman Act, 15 U.S.C. § 1; (2) for breach of contract; and (3) for tortious

1

interference with business expectancy. AWS disputes all three claims, asserting that it is Parler, not AWS, that has violated the terms of the parties' Agreement, and in particular AWS's Acceptable Use Policy, which prohibits the "illegal, harmful, or offensive" use of AWS services.

It is important to note what this case is not about. Parler is not asserting a violation of any First Amendment rights, which exist only against a governmental entity, and not against a private company like AWS. And indeed, Parler has not disputed that at least some of the abusive and violent posts that gave rise to the issues in this case violate AWS's Acceptable Use Policy. This motion also does not ask the Court to make a final ruling on the merits of Parler's claims. As a motion for a preliminary injunction, before any discovery has been conducted, Parler seeks only to have the Court determine the *likelihood* that Parler will ultimately prevail on its claims, and to order AWS to restore service to Parler pending a full and fair litigation of the issues raised in the Complaint. Having reviewed the briefs filed in support of and opposition to the motion, and having heard oral argument by videoconference, the Court finds and rules as follows.

## II.   BACKGROUND

Parler was founded in 2018, and describes itself as "a conservative microblogging alternative and competitor to Twitter." Compl., ¶ 1. Parler—like Twitter, Facebook, and other social media entities referenced in this action—is an online platform that allows third-party users, sometimes anonymously, to express thoughts and ideas for other users to read and comment on. Parler takes a laissez faire or "reactive" approach to moderation of its users' speech. *See, e.g.,* Parler's December 4, 2020 Community Guidelines, Decl. of Ambika Doran, Ex. B ("We prefer that removing community members or member-provided content be kept to the absolute minimum."). At the time of the filing of its Complaint, Parler claims to have had 15 million end-user accounts and a million downloads of its app per day. Decl. of John Matze, ¶ 3.

AWS, an Amazon.com, Inc. company, offers "computing services for businesses, nonprofits, and government organizations globally." Decl. of Amazon Exec. 2, ¶ 3 ("Exec. 2 Decl."). According to Parler, "AWS is the world's leading cloud service providers [*sic*], capturing a third of the global market." Compl., ¶ 11. In June 2018, Parler entered into a Customer Services Agreement ("CSA" or "Agreement") with AWS for the latter to provide "the cloud computing services Parler needs for its apps and website to function on the internet." Compl., ¶¶ 12, 13; *see* CSA, Exec. 2 Decl., Ex. A.

In recent months, Parler's popularity has grown rapidly, and around the time of the 2020 presidential election, according to Parler, millions of users were abandoning Twitter and migrating to the Parler platform. *See* Compl., ¶ 17. During this same time period, AWS claims that it received reports that Parler was failing to moderate posts that encouraged and incited violence, in violation of the terms of the CSA and AWS's Acceptable Use Policy ("AUP"). Exec. 2 Decl., ¶ 4; Ex. C (AUP). The AUP proscribes, among other things, "illegal, harmful, or offensive" use or content, defined as content "that is defamatory, obscene, abusive, invasive of privacy, or otherwise objectionable." AUP at 1. AWS claims that in recent weeks, it repeatedly communicated with Parler its concerns about third-party content that violated the terms of the CSA and AUP, and that Parler failed to respond to those concerns in a timely or adequate manner. *Id.*, ¶ 5.

AWS has submitted to the Court multiple representative examples, reflecting content posted on Parler during this period, that AWS claims violated the terms of the AUP and the parties' Agreement.[1] *See* Opp. Br. at 3-4. Parler has not denied that these posts are abusive or that they violate the Acceptable Use Policy. Parler does claim, however, that AWS knew Parler

---

[1] The Court will not dignify or amplify these posts by quoting them here.

was attempting "to address content moderation challenges," and that AWS appeared to be willing to cooperate in Parler's efforts. Matze Decl., ¶¶ 6, 7 (asserting "AWS's actions and communications led Parler's corporate officers to believe that, far from being concerned about remaining in a contractual relationship with Parler, AWS wished to expand that contractual relationship").

On January 6, 2021, supporters of President Donald Trump, seeking to overturn the results of the presidential election, marched on Congress, resulting in a violent and deadly riot at the U.S. Capitol. *See* Doran Decl., Ex. F. On January 8, Twitter and Facebook banned President Trump from their platforms. Compl., ¶ 18. Parler claims that in response to speculation that the President would move to Parler, there was a mass exodus of users from Twitter to Parler and a 355% increase in installations of Parler's app. *Id*., ¶¶ 2, 8. Parler also claims that the surge during this time was responsible for its failure to deal with a backlog of some 26,000 posts that it acknowledges "potentially encouraged violence" in violation of the AUP. *See* Rep. Br. at 4 (acknowledging "backlog of 26,000 instances of content that potentially encouraged violence").

On January 9, 2021, AWS notified Parler that it intended to "suspend all services" as of 11:59 p.m. Sunday, January 10. Ex. 1 to Compl., January 9, 2021 email from AWS to Parler ("It's clear that Parler does not have an effective process to comply with the AWS terms of service. . . . Given the unfortunate events that transpired this past week in Washington, D.C., there is serious risk that this type of content will further incite violence. . . .  Because Parler cannot comply with our terms of service and poses a very real risk to public safety, we plan to suspend Parler's account effective Sunday, January 10th, at 11:59PM PST."). At some time during the night between January 10 and 11, AWS suspended its services and Parler went dark.

On the morning of January 11, Parler filed its Complaint and the instant motion, seeking *ex parte* a TRO from this Court prohibiting AWS from suspending services. Parler failed, however, to provide the certification required under the Federal Rules, verifying that its counsel made an effort to serve AWS notice of the motion, or in the alternative, why notice should not be required. *See* Fed. R. Civ. P. 65(b)(1)(B); LCR 65. The Court therefore ordered Parler to provide notice of its motion to AWS. Further, the Court set a briefing schedule. As directed, AWS filed its opposition on January 12, and Parler filed a reply on January 13. On January 14, 2021, the Court held a hearing on the motion by videoconference. The Court and the parties agree that the motion for a temporary restraining order is now essentially one for a preliminary injunction, and is ripe for this Court's consideration.

### III. DISCUSSION

**A. Standard for Issuance of Preliminary Injunction**

As courts have repeatedly emphasized, an injunction represents an "extraordinary remedy" that is never awarded as a matter of right. *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). For a preliminary injunction to issue, the moving party has the burden of demonstrating all four of the following elements: (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction serves the public interest. *Winter*, 555 U.S. at 20.

In the wake of *Winter*, in which the Supreme Court narrowed the path to an injunction, the Ninth Circuit has maintained that a preliminary injunction "may also be appropriate if a movant raises 'serious questions going to the merits' and the 'balance of hardships tips sharply towards' it, as long as the second and third *Winter* factors are satisfied." *Disney Enters., Inc. v.*

*VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011)). Further, in the Ninth Circuit, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (quotation omitted).

### B. Likelihood of Success on the Merits

Parler's motion asserts three distinct claims. The Court reviews each in turn.

*1. Sherman Act Claim*

Parler alleges that AWS's termination of services is "apparently designed to reduce competition in the microblogging services market to the benefit of Twitter," and therefore violates Section 1 of the Sherman Act. Mot. at 3; 15 U.S.C. § 1 (prohibiting "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce"). To prove a violation of Section 1, Parler must show: "(1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020) (citing, *inter alia, Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 189–90 (2010)).

At this stage in the proceedings, Parler has failed to demonstrate that it is likely to succeed on the merits of its Sherman Act claim. While Parler has not yet had an opportunity to conduct discovery, the evidence it has submitted in support of the claim is both dwindlingly slight, and disputed by AWS. Importantly, Parler has submitted no evidence that AWS and Twitter acted together intentionally—or even at all—in restraint of trade. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 (2007)("[A]n allegation of parallel conduct and a bare assertion

of conspiracy will not suffice."). In contrast, AWS has submitted the sworn declaration of an AWS executive, explicitly denying the existence of any such agreement:

> To my knowledge, AWS and Twitter have never discussed, much less agreed upon, any policy, practice, or act directed at Parler. To the contrary, we have an internal policy never to discuss matters involving one customer with another customer. Nobody in my organization would be authorized to discuss Parler with Twitter without my authorization, knowledge, or involvement. I have not authorized any AWS employee to discuss Parler with Twitter, and I have not been involved personally in any such discussion.

Decl. of Amazon Exec. 1, ("Exec. 1 Decl."), ¶ 8.

Indeed, Parler has failed to do more than raise the specter of preferential treatment of Twitter by AWS. The sum of its allegation is that "by pulling the plug on Parler but leaving Twitter alone despite identical conduct by users on both sites, AWS reveals that its expressed reasons for suspending Parler's account are but pretext." Compl., ¶ 26. But Parler and Twitter are not similarly situated, because AWS does not provide online hosting services to Twitter. Parler's unsupported allegation that "AWS provides online hosting services to both Parler and Twitter" is explicitly denied in a sworn declaration by an AWS executive. *See* Exec. 1 Decl., ¶¶ 5, 6 ("Twitter's principal social-media service (the "Twitter Feed") does not run on AWS. . . . On December 15, 2020, AWS announced that it signed an agreement with Twitter for AWS to begin servicing the Twitter Feed for the first time. . . . We do not yet service the Twitter Feed, and I am not aware of any particular timeline for doing so."). Thus, as AWS asserts, "it could not have suspended access to Twitter's content" because "it does not host Twitter." Opp. Br. at 7; *see* Exec. 1 Decl., ¶¶ 5, 7 ("Because the Twitter Feed does not run on AWS, the Twitter Feed (and any tweets on the Twitter Feed) are not subject to, and thus cannot violate, Amazon's Acceptable Use Policy.").

In short, Parler has proffered only faint and factually inaccurate speculation in support of a Sherman Act violation. AWS, in contrast, has submitted sworn testimony disputing Parler's allegations. Parler therefore has failed to demonstrate at this stage a likelihood of success on its Sherman Act claim.

*2. Breach of Contract Claim*

The gravamen of Parler's breach of contract claim is that AWS terminated the Agreement without providing Parler 30 days to cure any alleged material breach.[2] Mot. at 9. Parler claims it is entitled to the 30-day cure period based on a provision in the CSA that provides "[e]ither party may terminate this Agreement for cause if the other party is in material breach of this Agreement and the material breach remains uncured for a period of 30 days from receipt of notice by the other party." CSA § 7.2(b)(i). As noted above, Parler alleges that AWS notified Parler that the latter was in material breach, for the first time, only hours before suspending or terminating services. *See* Matze Decl., ¶ 10.

AWS responds that it is Parler, not AWS, that has breached the Agreement. In particular, AWS claims that Parler breached Section 4.2 of the CSA, which requires Parler to "ensure that [Parler's] Content and [Parler's] and End Users' use of [Parler's] Content . . . will not violate any of the Policies," including AWS's Acceptable Use Policy. That AUP, as noted above, proscribes "activities that are illegal, that violate the rights of others, or that may be harmful to others, our operations or reputation" and "content that is defamatory, obscene, abusive, invasive of privacy, or otherwise objectionable." AUP, Exec. 2 Decl., Exs. A, C; *see* CSA ¶ 14; Opp. Br. at 6-7. AWS cites multiple examples of content posted on Parler's site that undeniably meet this

---

[2] AWS denies that it "terminated" Parler's account, claiming it merely "suspended" its services. Opp. Br. at 6. As discussed below, the distinction is not material to Parler's claim at this stage, however, as the CSA grants AWS the authority to take either action under the same circumstances. *See* CSA, §§ 6, 7.2(b)(ii).

definition. *See* AWS Opp. Br. at 3-4 (citing Exec. 2 Decl., ¶ 5; Ex. E at 1-3, 6-7, 13, 17, 28, 32, 49, 53-54).

Parler has not denied that content posted on its platform violated the terms of the CSA and the AUP; it claims only that AWS failed to provide notice to Parler that Parler was in breach, and to give Parler 30 days to cure, as Parler claims is required per Section 7.2(b)(i). However, Parler fails to acknowledge, let alone dispute, that Section 7.2(b)(ii)—the provision immediately following—authorizes AWS to terminate the Agreement "immediately upon notice" and without providing any opportunity to cure "if [AWS has] the right to suspend under Section 6." And Section 6 provides, in turn, that AWS may "suspend [Parler's or its] End User's right to access or use any portion or all of the Service Offerings immediately upon notice" for a number of reasons, including if AWS determines that Parler is "in breach of this Agreement." In short, the CSA gives AWS the right either to suspend or to terminate, immediately upon notice, in the event Parler is in breach.

Parler has not denied that at the time AWS invoked its termination or suspension rights under Sections 4, 6 and 7, Parler was in violation of the Agreement and the AUP. It has therefore failed, at this stage in the proceedings, to demonstrate a likelihood of success on its breach of contract claim.

3. *Intentional Interference with Business Expectancy Claim*

Under Washington law, in order to establish a tortious interference claim, Parler must prove: (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage. *See Leingang v.*

9

*Pierce Cty. Med. Bureau, Inc.*, 131 Wn. 2d 133, 157 (1997); *Pleas v. City of Seattle*, 112 Wn.2d 794, 800 (1989). Exercising in good faith one's legal interests is not improper interference. *Leingang*, 131 Wn. 2d at 157.

Parler has failed to allege basic facts that would support several elements of this claim. Most fatally, as discussed above, it has failed to raise more than the scantest speculation that AWS's actions were taken for an improper purpose or by improper means. Conversely, AWS has denied it acted improperly, justifying its actions as a lawful exercise of rights it had pursuant to either the suspension or the termination provisions of the CSA. Further, for the reasons outlined *supra*, §§ III.B.(1) & (2), Parler has failed to demonstrate the likelihood that AWS breached the CSA. To the contrary, the evidence at this point suggests that AWS's termination of the CSA was in response to Parler's material breach. Parler has therefore not demonstrated a likelihood of success on this claim.

### C. Irreparable Injury

Because likelihood of success is a threshold inquiry, when "a plaintiff has failed to show the likelihood of success on the merits, the Court "need not consider the remaining three *Winter* elements." *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015)(internal citation omitted). Given the gravity of the issues presented, the Court nevertheless will do so. As noted above, a plaintiff seeking a preliminary injunction must establish that it is likely to suffer irreparable harm in the absence of preliminary relief; importantly, a showing of a mere "possibility" of harm is not enough. *See Winter*, 555 U.S. at 20, 22 ("[T]he Ninth Circuit's "possibility" standard is too lenient."). Irreparable injury is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages. *See Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc*., 944 F.2d 597, 603 (9th Cir.1991).

In support of its claim to irreparable injury, Parler alleges that AWS's suspension or termination renders Parler unable to deliver the services it promises its users, and "entirely unable to function online." Mot. at 5.  Furthermore, Parler claims, the actions are a direct blow to its mission and reputation, and has caused a loss of user loyalty, advertising revenue, and the ability to raise capital. In short, Parler alleges, these actions have threatened it with "extinction." Rep. Br. at 11.

The injuries Parler alleges in its Complaint and its motion may be irreparable. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019)("The threat of being driven out of business is sufficient to establish irreparable harm.")(citing *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985)). But in *Winter,* the Supreme Court explicitly rejected the "possibility" of irreparable harm as "too lenient" to support a preliminary injunction, and in the hearing the Court held on this motion, AWS vigorously disputed that Parler has shown that its extinction is "likely" in the absence of an injunction. *See Winter*, 555 U.S. at 22; Trans. 1/14/21 Hrg., Dkt. No. 33, 15:8-23. The Court makes no finding on this issue, but notes that Parler's claims to irreparable harm are substantially diminished by its admission "that much of that harm would be compensable by damages." Rep. Br. at 11.

Parler's showing of a likelihood of irreparable injury, particularly in light of its failure to demonstrate a likelihood of success on the merits, is insufficient to support a preliminary injunction.

**D.  "Serious Questions Going to the Merits" and "Balance of Hardships"**

In the Ninth Circuit, a plaintiff may alternatively be awarded an injunction where it has raised "serious questions" going to the merits of its claims, and the balance of hardships, as between the two parties, "tips sharply" in its favor. *See Cottrell*, 632 F.3d at 1134-35 ("A

11

preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."). This analysis does not, however, aid Parler's cause. First, as discussed above, the likelihood of Parler prevailing on its claims is not a close call. Parler's allegations at this time are both inaccurate and unsupported, and are disputed by evidence submitted by AWS. Thus, its motion does not, on this record, raise "serious questions" going to the merits of its claims.

Second, while the "balance of hardships" may fall heaviest on Parler in the form of potential monetary loss, AWS has convincingly argued that forcing it to host Parler's users' violent content would interfere with AWS's ability to prevent its services from being used to promote—and, as the events of January 6, 2021 have demonstrated, even cause—violence. Opp. Br. at 11; Exec. 2 Decl., Ex. F. It cannot be said, therefore, that the balance of hardships "tips sharply" in Parler's favor.

### E.  The Balance of Equities and the Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. Parler argues that the public interest favors the consistent enforcement of contractual obligations, and lies "in fair and robust market competition." Mot. at 7-8. But Parler has not at this stage demonstrated a likelihood that it will prevail on its breach of contract, Sherman Act, or tortious interference claims. It therefore necessarily follows that the claims do not support a finding that the public interest weighs in favor of granting the injunction.

On the other hand, AWS argues that an injunction forcing it to continue hosting the Parler platform would pose a risk to public safety. Opp. Br. at 11; Exec. 2 Decl. Ex. F. Parler attempts to discount this interest by claiming that at the time AWS cut off its services, Parler was "already

taking steps" to develop a more effective content moderation system. Rep. Br. at 12. There is no debate, however, that forcing AWS to reinstate its services now, before such system can be implemented, would result in the continued posting of the kind of abusive, violent content that caused AWS to shut Parler down in the first place.

The Court explicitly rejects any suggestion that the balance of equities or the public interest favors obligating AWS to host the kind of abusive, violent content at issue in this case, particularly in light of the recent riots at the U.S. Capitol. That event was a tragic reminder that inflammatory rhetoric can—more swiftly and easily than many of us would have hoped—turn a lawful protest into a violent insurrection. The Court rejects any suggestion that the public interest favors requiring AWS to host the incendiary speech that the record shows some of Parler's users have engaged in. At this stage, on the showing made thus far, neither the public interest nor the balance of equities favors granting an injunction in this case.

## IV. CONCLUSION

Parler has failed to meet the standard set by Ninth Circuit and U.S. Supreme Court precedent for issuance of a preliminary injunction. To be clear, the Court is not dismissing Parler's substantive underlying claims at this time. Parler has fallen far short, however, of demonstrating, as it must, that it has raised serious questions going to the merits of its claims, or that the balance of hardships tips sharply in its favor. It has also failed to demonstrate that it is likely to prevail on the merits of any of its three claims; that the balance of equities tips in its favor, let alone strongly so; or that the public interests lie in granting the injunction.

///

For these and the remaining reasons articulated above, Parler's motion for a preliminary injunction is DENIED.

Dated this 21st day of January, 2021.

Barbara Jacobs Rothstein
U.S. District Court Judge